[No. A058358. First Dist., Div. One. Feb. 18, 1994.]

BLACK PROPERTY OWNERS ASSOCIATION et al., Plaintiffs and Respondents, v.
CITY OF BERKELEY et al., Defendants and Appellants.

**COUNSEL**

Manuela Albuquerque, City Attorney, and Thomas B. Brown, Deputy City Attorney, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Ken Alex, Deputy Attorney General, McCutchen, Doyle, Brown & Enersen, Daniel J. Curtin, Jr., Stephen L. Kostka and Ann R. Danforth as Amici Curiae on behalf of Defendants and Appellants.

Latham & Watkins, Linda M. Inscoe and Robert K. Break for Plaintiffs and Respondents.

**OPINION**

**STRANKMAN. P. J.**—This appeal by the City of Berkeley and its city council (the City) involves the City's compliance with the requirements of Government Code section 65583 and related sections in updating the housing element of its general plan; it also involves the application of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) to that update.

The trial court granted a petition for writ of mandate directing the City to: (1) rescind its adoption of the update and a negative declaration; (2) prepare a new initial study and an environmental impact report (EIR) analyzing the environmental effects of the City's existing housing goals and policies, including its 13-year-old rent control ordinance; and (3) adopt a housing element based on the results of the new EIR. We conclude that the City complied with both the Government Code and CEQA when it approved the update and adopted the negative declaration, and that no environmental

review of the rent control ordinance was required. We reverse the judgment and direct entry of a new judgment denying the petition.

FACTUAL AND PROCEDURAL BACKGROUND

The legislative body of every city and county is charged with adopting a general plan for its physical development, which must include a housing element consisting of several mandatory components. (Gov. Code, §§ 65300, 65302, subd. (c), 65583.) Each local government must review its housing element periodically to evaluate the community's progress toward attainment of local and state housing goals and objectives, among other factors. The element must be revised no less than every five years to reflect the results of this review. (Gov. Code, § 65588.)

The City's housing element was first updated in 1985. During the process of updating the element for the second time, the City conducted an initial study under CEQA to determine whether an EIR was necessary because the draft update contemplated possible construction of 747 additional housing units between 1990 and 1995. The initial study indicated that this new construction would not result in adverse environmental effects and would instead have beneficial effects. Based on this study, a negative declaration was prepared. The City adopted the housing element update and the negative declaration in July 1990.

Respondents, the Black Property Owners Association and others, filed a petition for writ of mandate and complaint for declaratory and injunctive relief challenging the approval of the update.[1] Their first amended petition alleged in pertinent part that the City violated Government Code section 65583 by failing to analyze adequately the effect of its rent control law on the maintenance, improvement, and development of housing in the City or to consider removal of that governmental constraint. The petition also alleged that the City violated CEQA by not preparing an EIR on the adverse consequences of its housing policies.

The rent control law which is the subject of respondents' concern is the Rent Stabilization and Eviction for Good Cause Ordinance, which was enacted by the City's voters in 1980 to regulate residential rent increases in the City. Among its provisions, the ordinance establishes a rent stabilization board (Board) and provides for annual general rent adjustments as approved

[1]According to the petition for writ of mandate, the Black Property Owners Association and respondent the Berkeley Property Owners Association are nonprofit associations of rental property owners, whose members include residents and property owners in the City. Respondent California Housing Council, Inc., is a nonprofit California corporation; its membership also includes residents and property owners in the City.

by the Board; it also provides for individual rent adjustments needed to allow a landlord a fair return on investment. The California Supreme Court has concluded that the ordinance is facially constitutional under both the federal and state due process clauses. (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 652-653, 679-693 [209 Cal.Rptr. 682, 693 P.2d 261].)[2]

The trial court granted the petition for writ of mandate as follows. The court directed the City to rescind its adoption of the housing element update and the negative declaration. It ordered preparation of a new initial study and an EIR, in accordance with CEQA, "analyzing the environmental effects of the City's housing goals and policies, and identifying possible feasible mitigation measures and alternatives to eliminate or reduce the potential adverse environmental effects of the City's housing goals and policies, including without limitation the secondary effects of the City's housing policies on work commute traffic and physical maintenance of Berkeley's housing stock."

The court also ordered: "In accordance with Government Code sections 65580 *et seq.*, and based upon the results of the new Environmental Impact Report, [the City] shall consider and adopt a Housing Element that (a) analyzes the impact of government-imposed constraints, including but not limited to the impact of Berkeley's Rent Stabilization and Eviction for Good Cause Ordinance, on the provision of adequate housing for all economic segments of the community, including middle income families, (b) considers the removal of and alternatives to the identified constraints, and (c) contains measures to mitigate the impact of government constraints that cannot be removed." Finally, the court awarded respondents attorney fees in the amount of $63,391.27 pursuant to Code of Civil Procedure section 1021.5.

In this appeal, the City argues: (1) its update complied fully with the Government Code; (2) it was not required by CEQA to analyze the continuing effect of the existing rent control and other housing-related ordinances in its initial study of the update project; and (3) even if the City's definition of the project subject to environmental review was too narrow, the court erred in directing it to prepare an EIR and redo its housing element, and in awarding attorney fees.

---

[2]The court also held that the ordinance did not conflict with federal antitrust laws. (*Fisher*, *supra*, 37 Cal.3d at pp. 655-678.) The United States Supreme Court affirmed, although based on a different antitrust analysis. (*Fisher* v. *Berkeley* (1986) 475 U.S. 260, 264-270 [89 L.Ed.2d 206, 210-215, 106 S.Ct. 1045].)

## COMPLIANCE WITH GOVERNMENT CODE SECTION 65583

■■ We begin with the City's contention that the analysis contained in its update was sufficient to satisfy the requirements of Government Code section 65583.[3]

The adoption or revision of a housing element is a legislative act which is reviewable by an interested party pursuant to Code of Civil Procedure section 1085. The Legislature has specified that the court's function in such a review is to determine whether the element "substantially complies" with article 10.6 of the Government Code (§§ 65580-65589.8). (§ 65587, subd. (b).) ■■ Substantial compliance means actual compliance with respect to the substance essential to every reasonable objective of the statute, as distinguished from simple technical imperfections of form. (*Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 297-298 [220 Cal.Rptr. 732]; *Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 348 [176 Cal.Rptr. 620]; Stats. 1984, ch. 1009, § 44, p. 3512.) The question of substantial compliance is one of law, which the appellate court reviews independently. (*Buena Vista Gardens Apartments Assn., supra,* at p. 298.)

■■ Judicial review of a housing element for substantial compliance with the statutory requirements does not involve an examination of the merits of the element or of the wisdom of the municipality's determination of policy. (*Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept., supra,* 175 Cal.App.3d at p. 298; see *Garat* v. *City of Riverside* (1991) 2 Cal.App.4th 259, 292-293 [3 Cal.Rptr.2d 504]; *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 674 [188 Cal.Rptr. 233].) If the municipality has substantially complied with the statutory requirements, the reviewing court will not interfere with the municipality's legislative action in updating or amending the elements of its general plan, unless that action was arbitrary or capricious or entirely lacking in evidentiary support. (See *Environmental Council* v. *Board of Supervisors* (1982) 135 Cal.App.3d 428, 439-440 [185 Cal.Rptr. 363].)

*Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334, and *Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept., supra,* 175 Cal.App.3d 289, are illustrative of the nature of our review. In *Camp,* the court held that a pamphlet purporting to be a housing element was not in substantial compliance; the pamphlet was only an obsolete housing inventory and did not include components mandated by statute, including standards and plans for the improvement of housing. (*Camp, supra,* at pp.

---

[3]All statutory references in this section are to the Government Code unless otherwise indicated.

350-351.) On the other hand, in *Buena Vista Gardens Apartments Assn.*, the court held that an affordable housing development program in a housing element was in substantial compliance with statutory requirements. Although the municipality might have included more detail and adopted other, perhaps more effective, programs, consideration of those factors would have been an impermissible review of the merits of the program. (*Buena Vista Gardens Apartments Assn., supra*, at p. 298.)

■ With the foregoing principles in mind, we compare the City's update with the statutory requirements. A housing element must include "[a]n assessment of housing needs and an inventory of resources and constraints relevant to the meeting of these needs." (§ 65583, subd. (a).) That assessment and inventory has several required components, including "[a]n analysis of potential and actual governmental constraints upon the maintenance, improvement, or development of housing for all income levels, including land use controls, building codes and their enforcement, site improvements, fees and other exactions required of developers, and local processing and permit procedures." That analysis "shall also demonstrate local efforts to remove governmental constraints that hinder the locality from meeting its share of the regional housing need in accordance with Section 65584." (§ 65583, subd. (a)(4).)

We agree with the City that it has actually complied with the substance of these requirements. Section III F of the update identifies and analyzes several physical, economic, and governmental constraints faced by the City in meeting its housing goals. Various local governmental constraints are discussed, such as building codes and inspections, the condominium conversion ordinance, design review requirements, engineering permits and fees, planning fees and permits, discretionary review by the board of adjustments, certain zoning ordinances, a neighborhood preservation ordinance, and rent stabilization and eviction control. The update concludes, however, that in most cases, these housing-related ordinances encourage preservation and upgrading of existing housing and protect other public values such as the preservation of neighborhood amenities and the quality of life in the City.

The discussion and analysis of the rent control ordinance considers its effect both on new construction and on the maintenance of existing housing. The update explains in some detail the arguments of the opponents and proponents of rent control as related to these two issues, and concludes that the ordinance has had a positive rather than negative effect on both. The update concludes that the rent control ordinance has probably had "the effect of increasing rents in the uncontrolled sector of the rental market, further increasing the incentives to develop new housing." It also states that the City

has actually met 96 percent of its 1980-1990 lower income housing production goal while preserving most of its existing affordable housing, an accomplishment which the analysis attributes to rent stabilization and other local legislation.

More analysis of rent control appears in section IV B, which describes the City's housing programs and activities between 1985 and 1990, the achievements of those programs, and the City's 1990-1995 goals. The update describes the ordinance as the City's "largest housing affordability program." After a brief history of the ordinance and an explanation of its operation, the update acknowledges and comments upon the existence of continued controversy about the program, discusses issues which have generated particular debate, and indicates that the board plans to take action shortly on the issue of permissible rent adjustments for buildings with historically low rents. It concludes that the continued protection of the ordinance is a 1990-1995 goal.

Rent-control-related issues are discussed elsewhere as well, including in section III C, which comments on housing affordability problems and summarizes findings of a 1989 study on the economic status of Berkeley households and a 1988 tenant survey by Bay Area Economics, Inc., excerpts of which were incorporated as an appendix. Among the conclusions in this section are that rent control has been successful in reducing tenant overpayment.

We conclude that the City's treatment of rent control in these and other sections of the update satisfied its statutory obligation to identify and analyze potential and actual government constraints upon the maintenance, improvement, and development of housing. Respondents' claim that the City has failed to include any analysis or has deferred its analysis to a later, indefinite time is simply wrong. Respondents' real quarrel is with the merits of the City's conclusions about the beneficial effects of rent control, but the wisdom of those conclusions is not subject to judicial review.

Respondents claim in a related argument that the City did not comply with section 65583, subdivision (c)(3), requiring a program which must "[a]ddress and, where appropriate and legally possible, remove governmental constraints to the maintenance, improvement, and development of housing." (§ 65583, subd. (c)(3).) Here, of course, direct repeal of the rent control ordinance by the City itself is legally impossible, as repeal of an ordinance enacted by initiative cannot be accomplished except by a vote of the people. (Berkeley City Charter, art. XIII, § 92(9); Elec. Code, § 4013.) Respondents concede as much, but argue that even so, the City should have considered

means of promoting repeal of the ordinance or mitigating its effect. As we have already discussed, however, the City does not see removal or mitigation of rent control as appropriate. Instead, it has concluded that rent control has had a positive effect on preserving affordable housing. Respondents' disagreement with that legislative determination does not provide a basis for judicial invalidation of the update.

Respondents also note without discussion that the Department of Housing and Community Development has published guidelines to assist localities in preparing housing elements, as if to imply that the City has not satisfied those guidelines. What respondents curiously do not mention is that the City did submit its draft update to the department, as required by section 65585. After the City complied with the department's comments as outlined in a review letter, the City was notified of the department's determination that the housing element update was in compliance with state law.[4] That determination, although not controlling in this lawsuit, is consistent with and reinforces our conclusion that the discussion and analysis in the update substantially complied with section 65583.

### COMPLIANCE WITH CEQA

The City contends that the court erred when it ordered the rescission of the negative declaration and the preparation of a new initial study and an EIR in accordance with CEQA, analyzing the effects of the City's "housing goals and policies." Emphasizing that the update did not propose a change in its long-standing rent control or zoning ordinances, the City argues first that the acknowledgment of existing law in its update was not an aspect of the project necessitating environmental review under CEQA.[5]

The requirements of CEQA are by now familiar. CEQA mandates preparation of an EIR on all "projects" that a local agency intends to carry out or approve that "may have a significant effect on the environment." (Pub. Resources Code, § 21151; Guidelines, § 15002, subd. (f)(1).)[6] A "project" as defined by CEQA and its Guidelines includes the whole of an action which

---

[4] In 1990 the Legislature enacted section 65589.3, which provides that in any action filed on or after January 1, 1991, to challenge the validity of a housing element, there shall be a rebuttable presumption of the validity of the element or its amendment if, pursuant to section 65585, the department has found the element of amendment substantially complies with the requirements of the article. The presumption does not apply here, as respondents' action was filed in August 1990.

[5] Amicus curiae briefs have been filed supporting the City's position on this issue by the Attorney General and by a group of California cities and counties and the University of California.

[6] Unless otherwise indicated, statutory references in this section of the opinion are to the Public Resources Code. References to Guidelines are to the administrative guidelines for

has a potential for resulting in a physical change in the environment, directly or ultimately. (§ 21065, subd. (a); Guidelines, § 15378, subd. (a); *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 277, fn. 16 [118 Cal.Rptr. 249, 529 P.2d 1017].)

■ But not all activities which might appear to come within that inclusive definition are subject to CEQA. By its own terms, CEQA applies only to discretionary projects proposed to be carried out or approved by public agencies, and not to ministerial projects. (§ 21080, subds. (a), (b)(1); Guidelines, § 15268.) Section 21080, subdivision (b), enumerates numerous other projects and activities to which CEQA does not apply, and case law and the Guidelines have added to the list of exemptions. Thus, the following are not projects under CEQA: (1) a city's placement of a rent control charter amendment initiative on the ballot in response to a citizen's petition (*Stein v. City of Santa Monica* (1980) 110 Cal.App.3d 458, 460-461 [168 Cal.Rptr. 39]); (2) a city's decision to call a special election on whether to amend a general plan (*Lee v. City of Lompoc* (1993) 14 Cal.App.4th 1515, 1519-1524 [18 Cal.Rptr.2d 389]; Guidelines, § 15378, subd. (b)(4)); and (3) a city's adoption of administrative guidelines to implement an ordinance enacted by initiative (*Northwood Homes, Inc. v. Town of Moraga* (1989) 216 Cal.App.3d 1197, 1206-1207 [265 Cal.Rptr. 363]; see Guidelines, § 15378, subd. (b)(3)). Whether a particular activity constitutes a project in the first instance is a question of law. (See, e.g., *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 795 [187 Cal.Rptr. 398, 654 P.2d 168]; *City of South Gate v. Los Angeles Unified School Dist.* (1986) 184 Cal.App.3d 1416, 1422 [229 Cal.Rptr. 568].)

If an activity is a project as defined by CEQA and not otherwise exempt, and the possibility exists that it may have a significant effect on the environment, the local agency must undertake an initial threshold study. (Guidelines, § 15063, subd. (a).) If the study reveals no substantial evidence to support a fair argument that the project will have the requisite effect, the local agency may adopt a negative declaration. (§ 21080, subd. (c); Guidelines, § 15070, subd. (a); *Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, 186 [228 Cal.Rptr. 868]; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].) If there is such substantial evidence, an EIR is required. (*Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612, 620 [263 Cal.Rptr. 813]; *Association for Protection etc.*

---

implementation of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) The Guidelines are to be afforded great weight except when a section is clearly unauthorized or erroneous under CEQA. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564, fn. 3 [276 Cal.Rptr. 410, 801 P.2d 1161].)

*Values* v. *City of Ukiah* (1991) 2 Cal.App.4th 720, 725-726 [3 Cal.Rptr.2d 488].)

Because general plans embody fundamental land use decisions that guide future growth and development of cities and counties, they have the potential for resulting in ultimate physical changes in the environment. Therefore, the adoption and amendment of general plans and their elements are projects within the meaning of CEQA. (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 529-533 [160 Cal.Rptr. 907]; Guidelines, § 15378, subd. (a)(1).) But when a proposed amendment to a general plan is the subject of an initial study, in most cases the agency will not be required to assess the environmental effects of the entire plan or preexisting land use designations. Instead, the question is the potential impact on the existing environment of *changes* in the plan which are embodied in the amendment. (See *Christward Ministry* v. *Superior Court, supra,* 184 Cal.App.3d at pp. 186-187, 190, 197; see also *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 165 [217 Cal.Rptr. 893] [when general plan amendment is among numerous approvals required for a particular development project, the question is the effect of that development on the environment].)

■ Although this case involves a statutorily mandated update to an element of a general plan rather than an amendment in conjunction with a particular development project or land use designation, we conclude that a similar approach to the scope of the required environmental review is appropriate.

As part of the City's obligation under Government Code section 65588 to review its housing policies, goals, and objectives, the revision included a description of its existing housing-related ordinances, including the rent control law. The revision also discussed the need for construction of over 700 units of new housing during the next 5 years. Because the revision was a project as defined by CEQA and the possibility existed that it might have a significant effect on the environment, the City conducted the necessary initial study. Consistent with its duty to assess the effects on the physical environment of any proposed changes in the element, the initial study analyzed the potential impact of the contemplated new housing construction and concluded that beneficial environmental effects would result.[7] Because no changes were proposed in the housing-related ordinances, no assessment of their environmental effect was required by CEQA. Therefore, the trial court erred when it concluded that the scope of the project subjected to environmental review was too narrow.

---

[7]There is no dispute in this case about that conclusion.

We recognize that in *Christward Ministry* v. *Superior Court, supra,* 184 Cal.App.3d 180, an EIR had been prepared in the past for the preexisting use ratified and acknowledged in the general plan amendment. (*Id.,* at p. 190.) But the rent control ordinance ratified and acknowledged in the update here was exempt from CEQA review because it was enacted by initiative. Respondents have cited no authority which supports their theory that the City was obligated to evaluate the environmental effects of an ordinance exempt from CEQA when enacted, and which the City took no action to expand, amend, or change in any way. *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795 [108 Cal.Rptr. 377], which respondents claim is directly on point, is inapposite. *Yorty* involved a groundwater management program and required the court to consider CEQA's applicability to projects approved and commenced before but not completed until after its effective date. (*Id.,* at p. 805.) The court's discussion of what the Legislature intended with respect to such projects has no bearing on the issue in the present appeal.

Our conclusion that the City's acknowledgment of its existing housing-related ordinances in its update was not an aspect of the project necessitating environmental review is consistent with the public policies underlying CEQA. The Supreme Court has observed that a fundamental purpose of an EIR is to inform the public and responsible officials of the environmental consequences of their decisions *before* those decisions are made. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 6 Cal.4th at p. 1123; *Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at pp. 563-564; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].) To require an EIR on the policies embodied in the rent control ordinance, which was not subject to CEQA when it was enacted 13 years ago by the voters of the City, and which the City has taken no action to change, would not further that statutory purpose.

## CONCLUSION

We have concluded that the City's update of its housing element satisfied the requirements of Government Code section 65583, and that its adoption of a negative declaration in conjunction with approval of the update complied with CEQA. Therefore, the trial court erred in granting respondents' petition for writ of mandate and awarding them attorney fees under Code of Civil Procedure section 1021.5. Our conclusion that the petition should have been denied makes it unnecessary to consider the City's contentions concerning the details of the nature and scope of the relief granted by the trial court.

## DISPOSITION

The judgment granting the petition for writ of mandate and awarding respondents attorney fees pursuant to Code of Civil Procedure section 1021.5 is reversed; the trial court is directed to enter a new judgment denying the petition for writ of mandate. Costs to appellants.

Newsom, J., and Stein, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 28, 1994.